**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| A.J.S., an individual, | Case No. 2:22-cv-3843 |
| Plaintiff, | |
| | **JUDGE** _____ |
| v. | Related Cases: No. 19-cv-849 |
| | No. 21-cv-4933 |
| **CHOICE HOTELS INTERNATIONAL,** | No. 21-cv-4934 |
| **INC.** | No. 21-cv-4935 |
| | No. 21-cv-5022 |
| Choice. | No. 22-cv-1924 |
| | No. 22-cv-2682 |
| | No. 22-cv-2683 |
| | No. 22-cv-2690 |
| | No. 22-cv-2734 |
| | No. 22-cv-3185 |
| | No. 22-cv-3202 |
| | No. 22-cv-3203 |
| | **DEMAND FOR JURY TRIAL** |

**COMPLAINT**

COMES NOW, the Plaintiff A.J.S. ("Plaintiff" or "A.J.S."), by and through her undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

**INTRODUCTION**

1.      Plaintiff A.J.S. is a survivor of human sex trafficking.

2.      A.J.S.'s life story reads like a tragedy wherein she was forced to endure violence, trauma, exploitation, manipulation, threats, isolation, humiliation, and degradation.

1

3. A.J.S. met a person that groomed her into trafficking. Ultimately her trafficker came to control every aspect of her life. The defining factor of the relationship between A.J.S. and her trafficker, was that each night, A.J.S.'s trafficker forced her to have sex with men for money.

4. A.J.S. was trafficked at a hotel owned by Defendant Choice Hotels International, Inc. ("Choice"). A.J.S.'s trafficker rented hotel rooms for one purpose—a location to engage in sex trafficking.

5. At Choice's hotel, A.J.S. was forced to engage in sex with many men every day. Every new customer was another instance A.J.S. was forced to have sex against her will—that is to say, A.J.S. was raped multiple times per day by multiple men when she stayed at Choice's hotel.

6. A.J.S.'s trafficker forced her onto Choice's property where she was repeatedly raped and forced to perform commercial sex acts with "buyers" under threats of physical and psychological abuse.

7. At some point, A.J.S. was able to escape the grasps of her trafficker and the prison of Choice's hotel rooms.

8. A.J.S. has spent a considerable amount of time attempting to regain the life that was stripped away from her as a result of her trafficking.

9. A.J.S. brings this lawsuit in an attempt to hold Choice, who imprisoned her accountable for its role in her trafficking.

**<u>OVERVIEW OF TRAFFICKING</u>**

10. A significant portion of all sex trafficking in the United States of America occurs within the hospitality industry at hotels and motels.

11. For decades, sex traffickers have brazenly operated in and out of hotels throughout this country. Traffickers paraded throughout hotels, while hospitality giants stood on the sidelines and did nothing. Instead, hotels and motels paid only lip service to campaigns against sex trafficking and stood by collecting millions in profits from their trafficking occurring on their properties.

12. Choice knew and has known for decades that they profit from sex trafficking repeatedly occurring under their brand flags.

13. Rather than taking timely and effective measures to stop profiting from this epidemic, Choice chose to ignore the open and obvious presence of sex trafficking on their branded properties, benefitting from the profit and fees created by rooms rented and Wi-Fi provided for this explicit and apparent purpose.

14. The sex trafficking industry alone pulls in an estimated $99 billion each year, making it the second largest illicit trade after the sale of all illegal drugs.[1] However, traffickers aren't the only profiteers. The hotel industry, including Choice, makes millions from participating in ventures that they knew or should have known engage in violations of 18 U.S.C. § 1591(a) through renting rooms where sex trafficking victims are harbored night after night and providing Wi-Fi that trafficker use to advertise and solicit victims for commercial sex acts. Choice and traffickers have a mutually beneficial relationship, fueled by the sexual exploitation of victims.

15. Choice and other members of the hospitality industry are and have long been aware of the prevalence of human trafficking, particularly sex trafficking, at hotels in general and at

---

[1] *Profits and Poverty: The Economics of Forced Labor,* INTERNATIONAL LABOR ORGANIZATION (2017), https://www.ilo.org/global/topics/forced-labour/statistics/lang--en/index.htm.

Choice's own properties. Choice and others in the industry have access to much public information on the prevalence of human trafficking at hotels, including reports by, among others, the Polaris Project created for the use of the hospitality industry.

16. The hospitality industry, speaking through industry organizations, has in recent years been increasingly vocal about its supposed "unified commitment" to combat human trafficking. Unfortunately, the near-total lack of concrete action by Choice and the rest of the hospitality industry shows that the industry in fact has a "unified commitment" to the very opposite: continuing with business as usual, so that Choice and all industry participants continue to profit millions from participating in a venture in violation of § 1591(a).

17. Choice's decision to prioritize profits over protecting sex trafficking victims resulted in the repeated sexual exploitation and rape of A.J.S. on their properties.

18. A.J.S., a survivor of sex trafficking, brings this action for damages against Choice pursuant to the Trafficking Victim Protection Reauthorization Act, 18 U.S.C. § 1595. Choice, knowingly benefitted from participation in a venture that it knew or should have known to be engaging in violations of 18 U.S.C. § 1591(a).

**PARTIES**

19. Plaintiff A.J.S. is a natural person and a resident and citizen of Madison, Ohio.

20. Plaintiff is a victim of trafficking pursuant to 22. U.S.C. § 7102(17) and 18 U.S.C. § 1591(a), and a victim of a "severe form of trafficking" as defined under 22 U.S.C. § 7102(16).

    a. Due to the sensitive and intimate nature of the issues, Plaintiff A.J.S. requests that this Court grant a protective order pursuant to Fed. R. Civ. P. 26(c) to permit her to proceed under a pseudonym and to ensure that Choice maintain the

4

confidentiality of Plaintiff's identity throughout the pendency of this lawsuit and after.[2]

b. Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[3] However, there are exceptions when the issues involved are of a sensitive and highly personal nature.[4] For good cause, the Court may issue an order to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense.[5]

c. Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. Plaintiff fears the stigma from her family, friends, employer, and community if her true identity is revealed in the public record.

d. Plaintiff should not be compelled to disclose her identity in order to maintain her privacy and safety. Plaintiff's privacy interest substantially outweighs the customary practice of judicial openness.[6]

---

[2] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

[3] Fed. R. Civ. P. 10(a).

[4] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See, e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir.); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

[5] Fed. R. Civ. P. 26(c).

[6] *Does I thru XXIII, 214 F.3d* at 1068 (joining its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

e. Moreover, Choice will not be prejudiced. Plaintiff will agree to reveal her identity to Choice for the limited purpose of investigating Plaintiff's claims once the parties have entered into a protective order. Plaintiff simply seeks redaction of Plaintiff's personal identifying information from the public docket and assurances that Choice will not use or publish Plaintiff's identity in a manner that will compromise her safety, personal life, personal relationships, or future employment prospects.

21. **<u>Defendant Choice Hotels International, Inc.</u>** is one of the largest hotel franchisors in the world and offers its brand public lodging services through its affiliates, subsidiaries, and franchisees. It is a Delaware corporation with its headquarters in Rockville, Davidson and can be served through its registered agent, United States Corporation Company, at 3366 Riverside Dr. Suite 103 Upper Arlington, OH 43221.

22. Choice owns, supervises, manages, controls, and/or operates the Columbus WoodSprings Suites located at 2305 North Wilson Road, Columbus, Ohio 43228 ("Columbus WoodSprings Suites").

a. The Columbus WoodSprings Suites is a Choice branded property.[7]

b. Choice employees work throughout the Columbus WoodSprings Suites by Choice. Choice employees work jobs including front desk and housekeeping. Choice is the principal with control over nearly every element of operations at the Columbus WoodSprings Suites by Choice. Choice is liable, either directly, vicariously, or indirectly through an agency relationship for the acts and/or

---

[7] *Our Brands*, CHOICE HOTELS, https://www.choicehotels.com/about/brands (last visited Jun. 9, 26 2022).

omissions of the employees at its branded hotels, including the Columbus WoodSprings Suites by Choice where A.J.S. was trafficked. Choice has an actual and apparent agency relationship with the physical property owner of the Columbus WoodSprings Suites by Choice as to establish vicarious liability.

c. Choice controlled and dictated the actions and inactions of the Columbus WoodSprings Suites by Choice through highly specific and detailed brand standards, policies, and procedures.

d. Choice knowingly benefited, or received something of value, from its commercial business ventures at the Columbus WoodSprings Suites by Choice through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where A.J.S. was trafficked, as well as in maintaining a positive public image for the Choice brand. Choice also benefited from gathering personal data from the Wi-Fi it provided to customers including A.J.S. and her trafficker.

e. Choice is subject to the jurisdiction of this Court because it regularly conducts business in Ohio, including through the operation of numerous hotels in Ohio, such as the Columbus WoodSprings Suites by Choice, contracting to supply services in Ohio. Choice has derived substantial revenue from services rendered in Ohio.

f. Whenever reference is made in this Complaint to any act, deed, or conduct of Choice, the allegation is that Choice engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or

representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Choice.

## JURISDICTION AND VENUE

23. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and under 18 U.S.C. § 1595 because this action arises under the laws of the United States.

24. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because a significant part of the acts and omissions giving rise to the cause of action occurred in this District.

25. Pursuant to Southern District of Ohio Local Rule 3.1(b), this case is related to Case Nos. 2:2021-cv-04935, 2:2019-cv-00849, 2:2021-cv-04933, 2:2021-cv-04934, 2:2022-cv-01924, 2:2021-cv-05022, 2:2022-cv-02682, 2:2022-cv-02683; 2:2022-cv-02690; 2:2022-cv-02734 2:2022-cv-03185; 2:2022-cv-03202; and 2:2022-cv-03203 currently pending before Chief Judge Algenon L. Marbley.

## FACTUAL BACKGROUND

### INTRODUCTION

26. A.J.S. brings her claims against major hotel brand corporations for violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA") 18 U.S.C. § 1595(a).

27. The TVPRA prohibits Choice from profiting from any venture they know or should know involves a violation of § 1591, and thereby establishes a non-delegable duty of reasonable care.

28. An overwhelming majority of commercial sex trafficking transactions occur within the hotels and motels, as trafficker use their rooms as the hub for their operations.[8] Hotels offer

---

[8] Bradley Myles, *Combating Human Trafficking in the Hotel Industry*, HUFFINGTON POST (Jul. 22, 2015),

anonymity and non-traceability, privacy, and discretion, making them ideal venues sex trafficking. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex. In addition, traffickers regularly use Choice's Wi-Fi to advertise and solicit victims for commercial sex against their will.

29.     As part of their conspiracy, to save costs and continually reap millions of dollars in profits, Choice generally failed to create, adopt, implement, and enforce company-wide policies and procedures regarding suspected incidents of human trafficking at the branded properties. Furthermore, Choice, did not train staff how to identify and respond to suspected human trafficking, failed to require training of all employees on human trafficking policies and procedures, and failed to conduct audits confirming compliance with policies and procedures.

30.     Choice kept no reports or data on suspected incidences or occurrences of human trafficking on their properties and the rate at which those occurrences changed as a result of implementing human trafficking policies and procedures. Choice did not establish mandatory and secure reporting mechanisms at the point of sale.

31.     With little to no risk posed to traffickers seeking to use Choice's rooms as a location to force victims like A.J.S. to engage in commercial sex against her will, the sex trade continues to thrive at Choice's branded properties while Choice reaps the benefits.

32.     Plaintiff's injuries are indivisible and cannot be separated. Plaintiff's injuries are the result of continued instances of ongoing violent traumatizing sexual exploitation.

33.     Choice is jointly and severally liable for the Plaintiff's damages in this case.

---

https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_ 7840754.

**THE SEX TRAFFICKING OF PLAINTIFF A.J.S.**

34.     A.J.S. met her trafficker when she was twenty-seven (27) years old.

35.     By means of a combination of force, coercion, violence, threats, manipulation, compelled use of and dependency on illegal substances, control over identification documents and possessions, and deprivation of basic survival necessities such as, but not limited to, food, water, transportation, shelter, and clothing, A.J.S. was held captive and sold for sex by her trafficker.

36.     While under the coercive control of trafficker, A.J.S.'s was imprisoned in hotel rooms rented by her trafficker who forced her to have sex for money. During that time, A.J.S. was trafficked at the Columbus WoodSprings Suites by Choice located at 2305 North Wilson Road, Columbus Ohio 43228.

37.     A.J.S and her trafficker stayed at the Columbus WoodSprings Suites by Choice from approximately the summer of 2016 to September 2021, frequently staying for days at a time within this period.

38.     During the time that she was trafficked, A.J.S.'s trafficker frequently rented rooms at the Columbus WoodSprings Suites by Choice because the rooms provided convenient, anonymous, and relatively central locations for "johns" that would pay to engage in sex with A.J.S.

39.     Throughout her trafficking, A.J.S.'s trafficker connected with "johns" by posting or causing to be posted advertisements on Mega Personals and Skip the Games advertising for A.J.S.'s availability for commercial sex. A.J.S.'s 's trafficker posted many of these advertisements and had conversations with "johns" while connected to Choice's Wi-Fi.

40.     A.J.S. was forced to have sex with multiple "johns" every day she was trafficked in the Columbus WoodSprings Suites by Choice.

41. During her captivity at Choice's hotels, A.J.S. was raped, continuously abused physically and verbally, malnourished, psychologically tormented, kidnapped, and imprisoned at the Columbus WoodSprings Suites by Choice.

42. At the Columbus WoodSprings Suites by Choice, A.J.S. encountered the same staff on multiple occasions. Choice's staff would have seen the signs of A.J.S.'s deterioration brought on by the abuse perpetrated by her trafficker, including bruising and verbal abuse occurring in public areas of the Columbus WoodSprings Suites by Choice as well as signs of malnutrition and poor health.

43. Every time A.J.S. interacted with Choice's staff, it was readily apparent that A.J.S. was under the control of her trafficker.

44. A.J.S.'s trafficker followed a repetitive and routine procedure during stays at the Columbus WoodSprings Suites by Choice.

45. The Columbus WoodSprings Suites by Choice front desk clerk and night manager had a close relationship with her trafficker. In fact, both employees bought illegal substances from A.J.S.'s trafficker regularly.

46. During one stay at the Columbus WoodSprings Suites by Choice, A.J.S. and her trafficker got into a loud altercation in the hallway. Other guests complained, and the front desk staff responded to the situation, and told A.J.S. and her trafficker they were being too loud. However, they did not inquire about A.J.S.'s safety or involve law enforcement.

47. A.J.S.'s trafficker would check in using a variety of fake forms of identification. Because A.J.S. and her trafficker were at the Columbus WoodSprings Suites by Choice so

frequently, and because two staff members knew her trafficker, the identification would have been obviously fake to the hotel staff.

48. The foot traffic of "johns" coming in and out of the A.J.S.'s room throughout the day and night was obvious. This foot traffic was captured by security cameras placed throughout the hotel.

49. A.J.S.'s trafficker was very violent with her at the Columbus WoodSprings Suites by Choice, and loud sounds of abuse and A.J.S.'s screams for help could often be heard from the room.

50. Further, with each stay at the Columbus WoodSprings Suites by Choice, it resulted in several consistent red flags, including, but not limited to: Paying for stays in cash; Paying for extended stays on a day-by-day basis; Requesting a room away from other guests; Obvious signs of illegal drug use; Frequent requests for linen changes; Unusually large number of used condoms in the trash; Unusually large number of male visitors asking for A.J.S. and her trafficker at the front desk and coming in and out of the hotel room; Visible signs of prior physical abuse; Asking the front desk not to be disturbed; Loud noises of abuse or other emergency audible to staff or other guests; Living out of the hotel room; Loitering and soliciting on hotel grounds; and Women wearing clothing inappropriate for the weather.

51. Plaintiff was repeatedly raped and otherwise sexually abused hundreds of times at the Columbus WoodSprings Suites by Choice.

52. These red flags were open and obvious to anyone working at the Columbus WoodSprings Suites by Choice for five years.

12

## CHOICE'S KNOWLEDGE OF SEX TRAFFICKING AT THEIR LOCATIONS

53. Choice is aware that the hospitality industry is a major life source of the human trafficking epidemic both in the U.S. and abroad.[9] The United Nations,[10] international non-profits,[11] and the U.S. Department of Homeland Security,[12] have documented this well-known epidemic of human trafficking for years and brought particular attention to the indispensable role of hotels. Choice cannot help but be aware of the public outcry against human trafficking, especially when so much of the uproar surrounds their industry.

54. For example, in 2004 End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States, identifying the steps companies would need to take to prevent child sex trafficking. ECPAT-USA identified hotel-specific best practices for preventing sex trafficking, such as: (1) not renting by the hour; (2) not permitting cash payments; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly; (5) watching for a trend of visitors to the same room; (6) being aware of rooms

---

[9] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[10] *Global Report on Trafficking in Persons,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (2020), 84 8available at https://www.unodc.org/documents/data-and-analysis/tip/2021/GLOTiP_2020_15jan_web.pdf; See also *We must act together to fight exploitation and human trafficking in tourism, say United Nations and international partners,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (April 24, 2012) available at https://www.unodc.org/unodc/en/press/releases/2012/April/we-must-act-together-to-fight-exploitation-and-human-trafficking-in-tourism-say-united-nations-and-international-partners.html

[11] The Polaris Project and ECPAT-International have published extensive reports and professional toolkits on human trafficking in the hospitality industry for years.

[12] Human Trafficking and the Hospitality Industry, U.S. DEPARTMENT OF HOMELAND SECURITY (2020), available at https://www.dhs.gov/blue-campaign/hospitalityindustry; Hospitality Toolkit, U.S. DEPARTMENT OF HOMELAND SECURITY (2016), available at https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number.

55. Further, nationwide campaigns have recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue and took initiative as early as 1997 with the United Nations Blue Heart Campaign[13] and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[14] These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released free online resources and toolkits publicly accessible to any entity concerned with human trafficking.

56. Choice, on information and belief, has access to individual hotel location do-not-rent ("DNR") lists that often list reasons for the refusal to rent, including the suspicion of human trafficking. Choice nevertheless does not share such information with other hotel locations, thereby preventing other of their hotel locations from acting to protect the victims of such suspected human trafficker.

57. Choice also has access to public police reports, news reports and internal reports generated by customers and employees, regarding sex trafficking at their own hotel locations in particular.

58. Choice has access to reviews left by guests on websites such as www.tripadvisor.com, www.yelp.com, www.google.com, and others, wherein guests frequently

---

[13] *The Blue Heart Campaign,* UNITED NATIONS (2022),
https://www.unodc.org/blueheart/#:~:text=The%20Blue%20Heart%20Campaign,help%20prevent%20this%20heinous%20crime.
[14] *DHS Blue Campaign Five Year Milestone*, DEP'T OF HOMELAND SECURITY (Jul. 22, 2015),
https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

complain about the prevalence of obvious prostitution, hearing physical violence by pimps, and other signs of human trafficking.

59. A brief examination of just a handful of examples suffices to show the extraordinary frequency with which Choice has long received and continues receiving evidence and reports that human trafficking runs rampant at their hotel locations:

    a. Regarding a stay in 2019 at the Columbus WoodSprings Suites by Choice, a hotel customer wrote a review saying, "To much goin on there drugs..... cops be there every day to bust people with drugs not safe"

    b. Regarding a stay at the Choice branded, Comfort Inn on 1213 E Dublin Granville Rd, Columbus, OH 43229, close to the Columbus WoodSprings Suites where A.J.S. was trafficked, a hotel customer wrote a review saying, "The worst hotel in America I wouldn't have even given them the one star but you have to put something. Staff very rude and unprofessional they are nasty don't change the sheets or do a good job cleaning your room oh yeah and they stole from me and my roommates while our company stayed there for almost a month. Nothing but drug dealers and prostitution going on all day and night this place deserves to be shutdown immediately. Oh here's a picture of one of the crackheads laying on the stairs in the hallway cocain is a hell of a drug. They deserve 5 thumbs down they ruined this company's name."

    c. Regarding a stay in 2015 at the Choice branded, Knights Inn located at 1300 E Dublin Granville Rd, Columbus, OH (now shut down), close to the

Columbus WoodSprings Suites where A.J.S. was trafficked, a hotel customer wrote a review saying, "This place is disgusting, I stepped in and tired old me opened the sheets and then all the sudden I saw bugs, I googled them to see what they were and it was bed bugs, as I was going to complain a woman/man approached me and asked "If I was the guy that ordered her off backpage" that's when I was done, prostitutes, bugs, disgusting and then on top of that there's young kids all over there drinking and having "Hotel parties" worse hotel in Columbus and needs shut down."

d. In 2014, a judge had ordered the same Knights Inn to be shut down November 2014 as it had been a haven for drug dealers and prostitutes.[15]

## CHOICE FACILITATED THE TRAFFICKING OF A.J.S.

60. Choice is a signatory of the Code[16] and thereby has promised to adopt these policies to combat trafficking. Yet, Choice has failed to implement most, if not all these policies, and continues to unlawfully benefit from the trafficking on their properties.

61. Defendant Choice is a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and Choice publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, Choice should not only have created effective Brand standards for implementation, mandates, and operations, but also enforced them.

---

[15] Kevin Parks, *Knights Inn ordered closed, called a public nuisance,* THE COLUMBUS DISPATCH (November 20, 2014) https://www.dispatch.com/story/news/local/northland/2014/11/21/knights-inn-ordered-closed-called/22706067007/
[16] *See Our Code Members,* ECPAT, https://www.ecpatusa.org/code-members

16

62.     Choice profited from the sex trafficking of Plaintiff A.J.S. Choice rented rooms to and provided Wi-Fi to A.J.S.'s trafficker when they knew, or should have known, that human trafficking was prevalent within their branded properties and at the specific locations where A.J.S. was trafficked. The hotel staff, especially front desk staff at the Columbus WoodSprings Suites by Choice knew or should have known of the obvious signs of A.J.S.'s trafficking.

63.     Choice benefited from the steady stream of income that A.J.S.'s trafficker and "johns" bring to their hotel brands. Choice profited from each and every room that A.J.S.'s trafficker and customers rented where A.J.S. was harbored and maintained for the purpose of sex trafficking. In addition, Choice profited from data collected each and every time A.J.S.'s trafficker and customers used Choice's Wi-Fi to advertise and solicit A.J.S. for commercial sex.

64.     Choice has made a public commitment to combat human trafficking, and thus, are aware that trafficking is a common problem in the hospitality industry. Choice should have been aware of the benefits they were receiving from the human trafficking occurring at the Columbus WoodSprings Suites by Choice where A.J.S. was trafficked given Choice's access to information, such as police reports, news articles, complaints, and negative reviews regarding the specific locations and surrounding areas.

65.     Moreover, Choice repeatedly collected data on A.J.S., her trafficker, and her "johns" from her many stays at the Columbus WoodSprings Suites by Choice, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data. Choice's employees witnessed the obvious signs of A.J.S.'s trafficking including signs of abuse, frequent male visitors coming in and out of the room, condoms in the trash, loud yelling and fighting, and others. Despite having access to all this information for

years, Choice failed to take reasonable measures to stop benefitting from sex trafficking occurring in their hotels. If Choice had taken proper measures, Choice would not have profited from A.J.S. and other victims like her being trafficked at their locations.

66. Choice discussed, developed, and implemented uniform policies and procedures to identify, prevent and mitigate the risk of human trafficking occurring at their properties, including the Columbus WoodSprings Suites by Choice where A.J.S. was trafficked. These policies included ongoing communication with its local hotels by including articles about human trafficking in newsletters, announcements at annual conferences, alerts to hotels in high-risk areas or in proximity to high-risk events, and field-based associates who visit hotels specifically to discuss human and sex trafficking issues.

67. Pursuant to these policies, Choice's employees and property management regularly reported customer data and other indicators of trafficking including suspicious criminal activity, web data indicating use of commercial sex websites, and data associated with reservations. The staff at the Columbus WoodSprings Suites by Choice where A.J.S. was trafficked reported this to Choice or would have if Choice did not fail to institute reasonable policies and procedures.

68. In addition, Choice had access to much of this data through the management of centralized data systems it required the branded properties to use, including but not limited to the property management, booking, credit processing, and information technology and internet systems.

69. Choice failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to stop reaping the benefits of sexual exploitation on their properties. Choice maintained its deficiencies to maximize profits by:

a. Failing to mandate and minimizing costs of training employees and managers on how to spot the signs of human trafficking and sexual exploitation;

b. Lowering operating costs and management costs by failing to analyze the data they received regarding criminal activity and customer reviews that indicated sex trafficking was occurring and taking the steps necessary to remedy the problems;

c. Collecting and utilizing massive amounts of data from all of their branded locations for marketing and other profit-driven purposes but failing to utilize this same data to combat sex trafficking in their hotels;

d. Failing to refuse room rentals, or report guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex trafficker or buyers;

e. Failing to monitor and track guest wireless network use for illicit commercial sex purposes or digital activity associated with human trafficking.

f. Failing to institute proper security measures, including, but not limited to, employing qualified security officers or appropriate cybersecurity measures to actively combat human trafficking and sexual exploitation; and

g. Failing to use its power as a parent company hold the franchisees accountable for contributing to the prevalence of sex trafficking on their properties.

70. As a direct and proximate result of these egregious practices on the part of Choice, A.J.S. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

19

**CHOICE'S CONTROL OVER THEIR BRAND HOTELS**

71. Upon information and belief, it is a standard practice in the hospitality industry, followed by Choice, for parent companies to set exacting brand quality standards reaching everything from the temperature at which coffee shall be served, to the number of pillows that shall be placed on each bed, to the types of funds accepted, to when, where and how guests should be greeted.

72. Choice provides their branded properties with signage on and in front of the building intended to assure customers that, if they check into that hotel, they can expect an experience consistent with the standards of the parent hotel brand. The same brand is emblazoned on everything in the hotel, from the pens on the bedside table to the staff uniforms at the front desk.

73. Choice provides its branded properties brand name recognition, a marketing campaign, and hotel listings in the Global Distribution System (GDS) and other online travel agency databases, as well as with access to their brand-wide central reservation systems, 800 numbers, revenue management tools, brand loyalty programs, and company websites. Thus, booking and room reservations are to a substantial extent controlled by Choice.[17] Choice sees booking and reservation trends, including for those branded hotels where Plaintiff was trafficked.[18]

74. Upon information and belief, Choice requires its branded hotel properties to use a property management system, which is linked to Choice's corporate network and data center, for, among other things, receiving reservations, and processing credit card transactions.

---

[17] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (Apr. 10, 2018), https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel- industry/.
[18] Where a branded hotel allows cash to be accepted for payment, monitoring and auditing these trends are important to identifying locations where criminal activity and commercial sex trafficking may be occurring.

75. Upon information and belief, per the relevant franchise agreements,[19] Choice may enforce its brand standards by means of periodic inspections of their brand hotel locations, backed up with the ultimate threat of termination of the franchise agreement.

76. Choice exercises day-to-day control over the Columbus WoodSprings Suites by Choice and its other brand hotels through centralized corporate systems, training, policies, and brand standards. Choice implements and retains brand hotel control over, including control over the Columbus WoodSprings Suites by Choice and, as either direct subsidiaries or under the terms of its franchise agreements.

77. Upon information and belief, Choice controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

    a. Requiring the branded locations to use Choice's property management system;

    b. Gathering reports of data generated by branded locations including reservation, payment, and occupancy information through Choice's centralized systems;

    c. Requiring branded locations to keep audit reports and other records;

    d. Conducting regular inspections for compliance with franchise agreement terms and Choice's rules and regulations;

    e. Providing marketing requirements and standardized marketing services for the branded locations;

    f. Regulating the all the policies, procedures, and standards of the branded

---

[19] Most franchise disclosure documents, which outline the policies and procedures of franchise agreements, can be accessed publicly for free by making an account on https://fddexchange.com/view-fdd-docs.

properties from the front desks to the bathrooms;

g. Requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

h. Requiring branded locations to install Choice's data transport system to share data with Choice corporate;

i. Providing training and orientation materials for branded property staff;

j. Requiring branded locations to make modifications to the branded properties upon Choice's request and to refrain from make substantial changes to the branded property without Choice's permission;

k. Regulating the rates for room rentals; and

l. Insurance coverage requirements.[20]

78. Choice manages corporate and branded property training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by Choice.[21]

79. Choice controls uniform and required reservation, marketing, customer support systems and loyalty programs at its branded hotels through national press releases, newsletters, emails, announcements on Choice's website, and mentions across its corporate media channels.[22]

---

[20] See e.g. Comfort Inn 2020 Franchise Disclosure Document, https://fddexchange.com/view-fdd-docs/comfort-inn-2020-fdd-franchise-information-costs-and-fees/
[21] *See* e.g. *Why Choice?,* CHOICE, https://choicehotelsdevelopment.com/why-choice (last visited Jun. 9, 2022). id. ("We've taken our teams' collective knowledge of hotel operations, technology, service and leadership, and developed the tools and resources our owners use every day to help run their businesses.").
[22] *Id.*

80. Choice mandates usage of a cloud-based centralized property management system called ChoiceADVANTAGE to its branded locations.[23]

81. Choice controls all hotel reservations made across its branded locations on its centralized reservation system called Choice Edge.[24]

82. Through its national sales team, Choice controls the credit processing system and the centralized direct billing at its brand hotels, including the Columbus WoodSprings Suites by Choice.[25]

83. Choice gathers data from its customers including names, payment information, reservation history, browsing data, other details associated with their stay for promotional and guest safety reasons.[26]

84. Upon information and belief, Choice requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place which gives Choice the ability to access, monitor, and harvest that internet data.

85. Under the guise of maintaining its "brand standards," Choice also forces its branded hotels to frequently undertake expensive renovations, remodeling, and construction efforts, as well as purchase mandated products with limited warranties which are shortened by such onerous and exorbitant requirements.[27]

86. Choice requires branded properties to comply with its corporate policies relating to Security and Guest Safety, Human Rights, Ethics, Corporate Governance, and compliance with

---

[23] *Connect the world through the power of hospitality*, CHOICE, https://www.choicehotels.com/about
[24] *Supra* n 101
[25] *Id.*
[26] Choice Hotels International, Inc. *Privacy & Security Policy,* https://www.choicehotels.com/legal/privacy-policy
[27] *See e.g.*, *Convert an Existing Hotel*, CHOICE HOTELS, https://choicehotelsdevelopment.com/ convert-a-hotel/#upscale (last visited Jun. 9, 2022).

the law.[28]

**CAUSES OF ACTION**

**COUNT 1: 18 U.S.C. § 1595 ("TVPRA")**
**(AGAINST CHOICE)**

87.     Plaintiff incorporates each foregoing allegation.

88.     Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is entitled to bring a civil action under 18 U.S.C. §1595.

89.     Choice's acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595. Specifically, Choice had a statutory obligation not to benefit financially or receive anything of value from a venture that they knew, or should have known, engaged in violating the TVPRA. At all relevant times, Choice breached this duty by facilitating violations of the TVPRA through their participation in the harboring, maintaining, soliciting, and advertising of Plaintiff and her trafficker for the purposes of commercial sex induced by force, fraud, or coercion.

90.     Choice has benefited as a result of these acts, omissions, and/or commissions by renting rooms and providing Wi-Fi to trafficker and customers, keeping operating costs low, maintaining the loyal customer base that fuels the supply and demand of sex trafficking, and limiting mandatory regulations. Moreover, on each occasion they received payment for rooms or received payments or kickbacks for internet usage, Choice directly benefitted from the sex trafficking of Plaintiff when it knew or should have known violations of §1591(a) were occurring.

---

[28] Choice claims to "strive to conduct [its] business operations free from violations of human rights" *See Human Rights Policy*, CHOICE HOTELS, https://www.choicehotels.com/about/responsibility/human-rights-policy (last visited Jun. 6, 2022).

The actions, omissions, and/or commissions alleged in this pleading were the "but for" and proximate cause of Plaintiff's injuries and damages.

91.     Plaintiff has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Columbus WoodSprings Suites by Choice.

a. Failing to mandate and minimizing costs of training employees and managers on how to spot the signs of human trafficking and sexual exploitation;

b. Lowering operating costs and management costs by failing to analyze the data they received regarding criminal activity and customer reviews that indicated sex trafficking was occurring and taking the steps necessary to remedy the problems;

c. Collecting and utilizing massive amounts of data from all of their branded locations for marketing and other profit-driven purposes but failing to utilize this same data to combat sex trafficking in their hotels;

d. Failing to refuse room rentals, or report guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex trafficker or buyers;

e. Failing to monitor and track guest wireless network use for illicit commercial sex purposes or digital activity associated with human trafficking.

f. Failing to institute proper security measures, including, but not limited to, employing qualified security officers or appropriate cybersecurity measures to actively combat human trafficking and sexual exploitation; and

g. Failing to use its power as a parent company hold the franchisees accountable

for contributing to the prevalence of sex trafficking on their properties.

## COUNT 2: NEGLIGENCE
## (AGAINST CHOICE)

92.     Plaintiff incorporates each foregoing allegation.

93.     At all times referenced in this Complaint, the Columbus WoodSprings Suites by Choice employees, property management, owners and franchisees were acting in the course and scope of their employment and/or agency relationship with Choice.

94.     Choice is responsible for the acts and omissions of its employees and agents under Ohio law.

95.     Choice owed a duty to Plaintiff to exercise reasonable care ensure safe conditions for guests and patrons at the Columbus WoodSpring Suites.

96.     At all times referenced in this Complaint, Plaintiff was a guest and patron at the Columbus WoodSprings Suites. Therefore, Choice had a duty to protect Plaintiff from injuries on their property and to ensure Plaintiff's safety. This duty included preventing her sexual exploitation and trafficking at the Columbus WoodSpring Suites.

97.     Choice breached this duty by failing to maintain the Columbus WoodSprings Suites in a safe condition.

98.     Choice breached its duty by failing to institute reasonable policies and procedures to prevent human trafficking of the Plaintiff and other victims on their branded properties, including the Columbus WoodSprings Suites by Choice. Choice breached its duty by failing to mandate human trafficking training, develop security protocols and reporting mechanisms, identify and mitigate suspected incidents of human trafficking and prostitution, monitor guest data and web traffic for red flags of human trafficking, and conduct audits and inspections at branded

26

properties with higher incidents of criminal activity, in high-risk areas of trafficking, and with complaints and reviews referencing trafficking activity.

99. Choice and its employees breached this duty by ignoring the red flags of Plaintiff's trafficking as well as direct interactions between staff and Plaintiff's trafficker at the Columbus WoodSprings Suites by Choice.

100. Choice breached this duty by creating an unsafe environment, hospitable to sex traffickers and their customers, at the Columbus WoodSprings Suites where Plaintiff was repeatedly trafficked and sexually exploited.

101. Had Choice taken steps to combat human trafficking on their properties, Plaintiff and other victims like her would not have been injured at Choice's properties, including the Columbus WoodSprings Suites.

102. Choice failed to take any steps to prevent the sexual exploitation of Plaintiff, who was a guest at the WoodSprings Suites while she was trafficked at that location.

103. As a direct and proximate result of Choice breaching its duty to Plaintiff, Plaintiff suffered severe and permanent injuries from being trafficked, sexually exploited, and raped hundreds of times at Choice's Columbus WoodSprings Suites property.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment as follows:

    a.    Awarding Plaintiff all available compensatory damages for each cause of action, including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; all available noneconomic damages,

including but not limited to pain, suffering, and loss of enjoyment of life;

b.      Disgorgement of profits obtained through unjust enrichment;

c.      Restitution;

d.      Statutory and/or treble damages, where available;

e.      Punitive damages;

f.      Attorneys' fees and expenses;

g.      The costs of this action;

h.      Pre- and post-judgment interest; and

i.      Any other relief the Court or jury deems appropriate.


## JURY DEMAND

Plaintiff hereby demands a trial by struck jury.


Dated: October 28, 2022

Respectfully submitted,

*/s/ Steven C. Babin, Jr.*
Steven C. Babin, Jr. (0093584)
Jennifer J. El-Kadi (00100660)
Kristina Aiad-Toss (0101336)
**Babin Law, LLC**
65 East State Street, Suite 1300
Columbus, Ohio 43215
T: 614-761-8800
E: steven.babin@babinlaws.com
Jennifer.elkadi@babinlaws.com
Kristina.aiad-toss@babinlaws.com
